In the Matter of a Plan for the Readjustment, Modification or Reorganization of the Rights of All the Holders of Mortgage Investments Represented by Series C-2 First Mortgage Participation Certificates Issued and Guaranteed by NEW YORK TITLE AND MORTGAGE COMPANY.

Supreme Court, Additional Special Term, New York County, June 12, 1937.

*Sherman S. Rogers*, for the trustees of Series C-2.

*Weil, Gotshal & Manges*, for Series C-2 committee.

*Abraham N. Geller* and *Wise, Shepard, Houghton & Hoffman*, for the sponsoring certificate holders.

*Benjamin J. Rabin*, for the Mortgage Commission of the State of New York.

FRANKENTHALER, J. The court is now called upon to fix the allowances to be made to attorneys who have rendered valuable services in connection with the reorganization of Series C-2 of the New York Title and Mortgage Company. The principal amount of the issue at the time of the reorganization was $24,419,857.83, making it the second largest group series involved in the entire guaranteed mortgage situation. It is the most widely held of all the issues, there being approximately 7,500 separate certificate holders.

It was not until June 1, 1935, that a proposed plan of reorganization for Series C-2 was actually promulgated. This plan, promulgated by the Mortgage Commission, departed from the trustee plans previously approved by this court in Series F-1 and in other issues in two important respects: (1) In the form of trustee proposed; and (2) in the manner of the trustee's selection. It called for a corporate trustee, controlled by the Mortgage Commission through majority representation on a board of five directors, and it provided that the other two directors were to be appointed by the court. For reasons indicated in its opinion, this court modified the plan so as to make it conform with the plans theretofore approved by it in other group issues. (*Matter of New York Title & Mortgage Co.* [*Series C-2*], 156 Misc. 667.) After the plan, as modified by the court, had received the approval of the requisite number of certificate holders, trustees were appointed in April, 1936, in accordance with the wishes of the certificate holders as expressed in the balloting. The trustees have been administering the affairs of the issue ever since.

For a period of three years prior to the designation of the trustees there had been no distribution of principal or interest, the last distribution, amounting to one per cent, having been made in March or April, 1933, on account of interest. During these three years the net income of the issue had been only one-quarter of one per cent per annum. In contrast with this, during the seven months from May 1, 1936, to December 31, 1936, the trustees' management produced a net income at the rate of two and one-half per cent per annum, ten times the rate earned in the three years immediately preceding their appointment. The trustees have already paid $485,000 to the certificate holders by way of interest, and, in addition, they have made a distribution of one and one-half per cent on account of principal.

The principles governing applications for allowances in proceedings of this character have been set forth at length in the opinion handed down by this court in fixing allowances for services rendered in the reorganization of Series F-1, the largest of all the issues

(*Matter of New York Title & Mortgage Co.* [*Series F-1*], 160 Misc. 283), and no useful purpose would be served by repeating them here. Nor is anything to be gained from a detailed resumé of the efforts to reorganize Series C-2, for the history of the reorganization of Series F-1, to be found in the opinion previously mentioned, is, to a very great extent, the history of all other large guaranteed mortgage reorganizations. The chaotic conditions and the difficulties confronting those who attempted the reorganization of Series F-1 were the same as those which faced the reorganization committees of every other certificated issue, particularly the group issues. The various events which led to the gradual evolution of the trustee plan adopted for Series F-1 are identical with those which culminated in the adoption of a trustee plan for Series C-2.

In fixing the allowances to be made for services rendered in the reorganization of Series C-2 it is, however, important to bear in mind that the plan adopted for Series C-2 was modeled upon the one adopted for Series F-1 almost a year before. The trail had already been blazed and most of the complex legal problems settled. The task of reorganizing Series C-2 was, therefore, very much lightened and simplified by the work done in Series F-1. For these reasons the fees allowed for services performed in connection with Series C-2 must be relatively smaller than those awarded in Series F-1. On the other hand, it must not be overlooked that there are almost twice as many certificate holders in Series C-2 as there are in Series F-1 (about 7,500 in C-2; about 4,500 in F-1), and that the difficulty of obtaining concerted action and the consents of the requisite number of certificate holders was, therefore, considerably greater in Series C-2 and took a good deal longer. Certificates of Series C-2 were not legal investments for trust funds, with the result that there were no large holdings by banks and estates as there were in the case of other issues. Efforts to obtain from certificate holders sufficient funds to promulgate a plan proved fruitless until the very eve of the promulgation of the plan, which, with the modifications made by the court, was finally adopted. Although the reorganization of Series F-1 was completed and trustees appointed in May, 1935, it was not until almost a year later that the C-2 trustees were designated. During this additional year many legal problems arose which were absent in Series F-1, and which required the time, attention and services of those who were attempting to bring about a successful reorganization.

The largest part of the work involved in the reorganization of Series C-2 was concededly done by Weil, Gotshal & Manges, counsel for the reorganization committee formed in December,

1933. Their role in Series C-2 is comparable to that of the firm of Wagner, Quillinan & Rifkind in Series F-1, although, as previously observed, their task was made much easier as a result of the groundwork laid by the latter. It is agreed by all that the firm of Weil, Gotshal & Manges is entitled to the major share of the credit for the success of the C-2 reorganization. Some of the other applicants for allowances have contributed valuable assistance in connection with various phases of the proceedings which finally brought about the reorganization and the appointment of the trustees and they deserve to be compensated accordingly. Other applicants have rendered no services for which they may be properly compensated out of the C-2 funds and they must look to their own clients for such compensation, if any, as they may be entitled to receive for the work which they performed.

As this court said in *Matter of New York Title & Mortgage Co. (Series F-1)* (*supra,* pp. 307, 308): " In determining the amount of the allowances which are to be made to the applicants whose services merit them, the court has kept uppermost in its mind the plight of the unfortunate certificate holders. * * * Allowances payable out of funds belonging to certificate holders must necessarily be considerably less than they would be under ordinary and normal circumstances."

The amounts allowed are as follows:

| Name of Applicant | Amount Allowed | Disbursements Allowed |
|---|---|---|
| Weil, Gotshal & Manges... | $32,500 | $1,071 81 for committee 904 77 for applicant |
| Wise, Shepard, Houghton & Hoffman and Abraham G. Geller............. | 5,000 | 1,799 61 |
| Leon Leighton........... | 4,000 | ...... |
| Edward Endelman........ | 2,000 | ...... |
| Thomas Keogh........... | 1,500 | ...... |
| Sylvester & Harris........ | 500 | ...... |
| Chamberlain of the City of New York............. | (No allowance asked except disbursements) | 4,998 32 |
| Maurice B. and Daniel W. Blumenthal and Natanson, Pack & Scholer..... | 1,500 | 855 01 |
| Smith, Chambers & Clare.. | 500 | ...... |
| Harris Jay Griston........ | 500 | ...... |
| Total | $48,000 | $9,629 52 |

The total allowances and disbursements is $57,629.52, which is less than one-fourth of one per cent of $24,419,857.83, the principal amount of the issue. This means that the cost of the reorganization is less than twenty-five cents to the holder of a $100 certificate, payable out of moneys now in the hands of the trustees without any assessment upon the certificate holders.

Submit order on notice.